1348

HOTEL CONQUISTADOR, INC., for
itself and as successor by merger
to Tropicana Casino, Inc.

v.

The UNITED STATES.

No. 374–75.

United States Court of Claims.

Decided April 18, 1979.

As Amended on Denial of Rehearing and
Rehearing En Banc May 25, 1979.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

NICHOLS, Judge.

This tax case is before the court on cross-motions for summary judgment on stipulated facts. The plaintiff is suing for itself and as successor by merger to Tropicana Casino, Inc., the latter having operated a casino on the former's hotel premises at Las Vegas, Nevada. The issues concern calendar year 1971 taxes of the sort commonly designated as FICA (Federal Insurance Contributions Act) and FUTA (Federal Unemployment Tax Act), assessed with respect to employees' wages. Both taxpayers had large staffs: culinary workers, bartenders, waiters, carpenters, plumbers, electricians, gardeners, parking lot attendants, etc., whose wages (excluding the alleged wages in dispute) did not exceed $7,800 per year. Most of these were required to wear uniforms which the employer furnished free of charge. All were allowed at least one meal per day, some two, without charge, at an employees' cafeteria. Plaintiff says the value of each meal was 45 cents, defendant $1.25. Some employees, of those involved, were union members whose collective bargaining agreements called for these meals and specified a minimum quality: "palatable, wholesome, and comparable in quality to those served to customers." Other unions did not have any agreement concerning meals, and some employee categories were non-union, but management treated all alike in this respect. The eating place for all was a windowless basement cafeteria, off limits for guests.

Some more privileged employees, *e. g.*, showgirls, could eat at half price or free in a coffee shop frequented by guests, but they are not involved in this suit. The management was willing to provide all this free food primarily to minimize the amount of time employees would need for meals during working hours, but also realized it would help to attract and hold employees. Meal periods ranged in time from 30 to 45 minutes. Because of the unavailability of

adequate, nearby meal facilities, one hour to one hour fifteen minutes would have been required for meals not served on the premises. The uniformed employees, the majority, were not allowed to use the public restaurants on the premises in uniform or to wear uniforms at all off the premises. Thus the management would have had to provide additional time for changing clothes.

Management used 45 cents as an addition to or part of "wages" in computing the FICA and FUTA taxes. Defendant on audit insisted that the proper figure was $1.25. Where it got that figure the stipulation does not show, but by the collective bargaining agreements already mentioned, management could at its option pay $1.25 in lieu of each free meal. The stipulation does not reflect that this option was ever exercised. Plaintiff in its "protest" said the $1.25 was a penalty, but this is not stipulated.

Plaintiff now contends that the involved meals were not "wages" or not "remuneration" in any part. Thus the taxes were, according to it, overpaid from the beginning, even so far as based on the 45 cents meal value. Whether it made a proper claim for refund as to that is an issue in the case. There is no question that it paid on demand the additional taxes due on the $1.25 rate and that it has properly claimed refund as to them, having paid the employees' portion, without withholding, as well as its own. It is conceded that ordinary income taxes are not applicable: by virtue of I.R.C. § 119, the "convenience of the employer" test is incorporated in statute law and is decisive there. Plaintiff collected from employees by withholding the portion of the FICA taxes applicable to them, on the 45 cents value, but it disclaims any intent to sue here as their surrogate. Thus there are at issue here, on the 45 cents value, only the employer's portion of the FICA tax paid, and on the 46 cents—$1.25 value, both portions. There is no employees' portion of the FUTA tax, so that complication does not arise.

Our determinations make it unnecessary to decide whether the 45 cents or the $1.25 values are correct, and there is no triable issue of fact as to any value under 45 cents or over $1.25. They set for our purposes the minimum and maximum value of the meals, so far as value may be pertinent. Defendant made some faint effort to suggest the meals might be worth over $1.25, because of the contract requirement, with some unions, that meals be "comparable in quality to those served to customers." But there is nothing to show what was served customers. Meals taken by many people in the middle of their working day are but snacks, and no doubt customers, even wealthy ones, also wanted snacks very often. Plaintiff may have operated Lucullan gourmet restaurants, but there was also a coffee shop. We need not assume an issue as to any higher value in the absence of any effort to prove the IRS was in error in setting the value at $1.25. There is thus nothing to show that some unions exacted, for their members, any more than a $1.25 meal would normally imply. We are not required, as judges, to forget all our knowledge of how things are, and we know that nobody, in 1971, could have bought a Lucullan gourmet meal for $1.25, even in Las Vegas, Nevada. At that value, the meals "represented an average of 8.3 percent of employee's gross wages," per the stipulation.

■ We hold that the involved meals were not "remuneration" and, therefore, not "wages." Both are terms of art which require, beyond mere semantics, a careful analysis of the context in which Congress uses them and the meanings they have been given, both in regulations and in decided cases.

■ For FICA and FUTA purposes, as well as for income tax withholding, "wages" are "all remuneration for employment * * * including the cash value of all remuneration paid in any medium other than cash; * * *." I.R.C. §§ 3121(a), 3306(b), 3401(a). The provision of I.R.C. § 119 excluding from gross income the value of meals and lodging furnished an employee, on the business premises of the employer and for his convenience, does not apply by its terms to FICA and FUTA taxes.

The Supreme Court has held in *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), that because of the differences in statutory language used, there does not have to be congruence between the scope of the ordinary income tax, on the one hand, and "wages" on the other. Though defendant here derives encouragement from this, it was written there as to a situation where the income tax liability was assumed and defendant wanted the withholdable "wages," there at issue to conform. The Court pointed out that "wages," the sole basis of FICA and FUTA taxation, is a less inclusive term than "income," which includes "wages" and much besides. The issue was the taxability of expense reimbursement for meals consumed by employees in travel status but not away from home overnight. Defendant said, if such reimbursement was "income" it must be "wages" and the Court perceived this as an obvious non sequitur. It is another matter altogether to say that "wages," though normally a narrow term compared to "income," may include some items that "income" does not include. This proposition cannot be said to derive any support from the Supreme Court's decision. We cannot rest our decision on the converse proposition, however, tempting though it may be to do so, because of the special impact of § 119 on the definition of "gross income," but not of "wages." Defendant's effort to define "wages" as broader than "income," though it may generate some badly needed revenue, certainly cannot be commended as facilitating the simplicity and uniformity that are so badly needed when thousands of employers are required to act as deputy tax gatherers from millions of employees.

Defendant cited in its original brief, quoted from and relied heavily on, the decision in *Central Illinois Public Service Co. v. United States*, 540 F.2d 300 (7th Cir. 1976), the decision reversed after the brief was written by the Supreme Court's decision above discussed. The Seventh Circuit called "unpersuasive" and elected to go into conflict with *Royster v. United States*, 479 F.2d 387 (4th Cir. 1973). That case holds that reimbursement to salesmen for meals eaten while on the road was not "wages" because not "remuneration," noting that the reimbursement served the employer's purpose of deterring the salesmen from returning home to eat and thus enhancing their reimbursable mileage. It distinguished a case where employees were required to be on call while eating and thus remained at the employer's disposition. In *Royster*, the employees rendered no service while eating, and thus the reimbursement could not be remuneration for service rendered. Without overstressing the point, we note it was not the *Royster* decision that the Supreme Court reversed.

Our decisions in other fact situations stress the divergence between "income" and "wages" and the lesser coverage of the latter word. *Peoples Life Ins. Co. v. United States*, 373 F.2d 924, 179 Ct.Cl. 318 (1967) (employer paid employees' expenses for attending conventions of such employees); *Humble Oil & Refining Co. v. United States*, 442 F.2d 1362, 194 Ct.Cl. 920 (1971) (reimbursement for moving expenses to employer's new headquarters); *Humble Pipe Line Co. v. United States*, 442 F.2d 1353, 194 Ct.Cl. 944 (1971) (same); *Allstate Insurance Co. v. United States*, 530 F.2d 378, 209 Ct.Cl. 1 (1976) (reimbursement for indirect moving expenses; cites with approval and follows *Royster, supra*.)

Besides reversing the result in *Central Illinois, supra*, the Supreme Court also took the trouble to disapprove certain language of the court below, saying—

> An expansive and sweeping definition of wages, such as was indulged in by the Court of Appeals, 540 F.2d, at 302, and is urged by the Government here, is not consistent with the existing withholding system. As noted above, Congress chose simplicity, ease of administration, and confinement to wages as the standard * * *. [435 U.S. at 31, 98 S.Ct. at 922.]

The disapproved definition is, among several statements at 540 F.2d 302, apparently the following:

> Remuneration for services cannot be viewed this narrowly. [*I. e.*, as in *Royster.*] The employment relationship is a

two-sided bargain, with the employee's services being given for a total package of remuneration, including salary, pension, paid vacation time and other remuneration such as reimbursed lunches. * *
It may be noted, as will be more fully developed later, even the Treasury does not contend that every expense incurred by the employer that tends to make the job more acceptable to the employee, constitutes "remuneration" and "wages."

We think the following analysis is supported by the authorities cited and in turn supports the result we reach, that the involved meals were not "wages."

1. With respect to the non-union employees, and the union ones whose unions did not bargain for free meals, the concept of an exchange of services for a "total package of remuneration" must be rejected as fictitious. With respect to the union members whose unions obtained commitments for free meals, the stipulation does not state whether such commitments preceded or followed adoption of a company policy for free meals. There is nothing to show that negotiations ever weighed free meals with cash wages and other benefits, as a total package, or that proposals by either side respecting such meals weighed their value against other elements of the total compensation. While the management realized the free meals would help to attract and hold employees, the stipulation makes it clear that the principal reason for the free meals was the aid they gave in implementing company policy.

2. Defendant conceded that the meals were furnished for the convenience of the employer. The principal reason was to keep uniformed employees out of the public restaurants of the hotel except in line of duty, and from leaving the hotel in uniform to purchase meals elsewhere; on the other hand, to avoid expense of time (we suppose on pay status) changing in and out of uniform in the middle of the work day. Also, the free meals facilitated keeping lunch periods down to 30 or 45 minutes. The free meals thus tend to make feasible company

policies that otherwise would be irksome and difficult to enforce.

3. There is nothing to show that any work is done or service rendered by the employee while he is consuming the free meal. He is not lured into the cafeteria for the purpose of extracting any benefit for the employer while he is there, except the negative benefit already stated, of his not being in some other place. No employee is required to eat in the cafeteria, and there is nothing to suggest that "brown-bagging" would not be an acceptable alternative.

4. Certain kinds of employment may have as their incidents such massive quantities of free food or lodging or both as to compel the inference that the cash wage could not but be set lower in light of these emoluments, i. e., that the wage is paid in part in non-cash benefits. This case is not in that category. In that regard, it may be noted incidentally that the meal allowance in *Central Illinois, supra,* $1.40, is referred to as modest even for 1963, not "a money making proposition for an employee.'" (435 U.S. at 23 n. 3, 98 S.Ct. at 918 citing the District Court, 405 F.Supp. 748, 749.) A $1.25 figure for 1971 must be considered more modest than modest. Any "total package" view of the $1.25 would also have to take into account the irksome restrictions that go with it. If the $1.25 value is regarded as compensation for being in the cafeteria for 30 or 45 minutes (and not elsewhere) inquiry would be necessary whether the applicable minimum wage was respected.

5. The value of the free meal did not have any fixed or established proportion to the value of the employee's services as stated in money. The lowest paid employee might eat the most, just as he might need the most health benefits.

Plaintiff argues that the "convenience of the employer" test much antedates its first introduction into statute law as § 119 of the 1954 Code, although it admits that efforts by defendant to exclude the test from FICA and FUTA cases, while applying it to income taxes, also antedates 1954. It urges that "wages" must mean the same thing for

withholding for income taxes (I.R.C. § 3401) as it does in connection with FICA and FUTA taxes, because the same language is used. If plaintiff is right, since the payments pass the "convenience of the employer" test, all other tests are avoided. Defendant argues that the holding in *Commissioner of Internal Revenue v. Kowalski*, 434 U.S. 77, 98 S.Ct. 315, 54 L.Ed.2d 252 (1977) in effect is that § 119 preempts prior law on the "convenience of the employer" test making it applicable only where § 119 expressly says it is applicable, *i. e.*, in ordinary income tax cases. We are going to assume for purposes of this opinion that defendant is right, although anything said in *Kowalski* must be regarded as dictum so far as concerns FICA and FUTA taxes, which were not before the Court. See comment on *Kowalski* in *Central Illinois, supra*, 435 U.S. at 24–25, 98 S.Ct. 917. Where defendant is in error, clearly, is that dethroning "convenience of the employer" as the sole test does not mean the court is required to ignore, in defining "remuneration," whether the employer furnishes free meals primarily to effectuate his own policies, or to sweeten the pot for employees.

Defendant also relies on statements in Treasury Regulations on Employment Tax (1954 Code) Section 31.3121(a)–1 (on FICA, but § 31.3306(b)–1 on FUTA is similar):

(c) The name by which the remuneration for employment is designated is immaterial. Thus, salaries, fees, bonuses, and commissions on sales or on insurance premiums, are wages if paid as compensation for employment.

\* \* \* \* \* \*

(e) \* \* \* the medium in which the remuneration is paid is also immaterial. *It may be paid in cash or in something other than cash, as for example, goods, lodging, food, or clothing.* Remuneration paid in items other than cash shall be computed on the basis of the fair value of such items at the time of payment. \* \*

(f) Ordinarily, facilities or privileges (such as entertainment, medical services, so-called "courtesy" discounts on purchases), furnished or offered by an employer to his employees generally, are not considered as remuneration for employment if such facilities or privileges are of relatively small value and are offered or furnished by the employer merely as a means of promoting the health, good will, contentment, or efficiency of his employees. *The term "facilities or privileges," however, does not ordinarily include the value of meals or lodging furnished, for example, to restaurant or hotel employees, or to seamen or other employees aboard vessels, since generally these items constitute an appreciable part of the total remuneration of such employees.*

The emphasis on certain lines is that of defendant in its brief.

Careful reading of these passages will show that the regulation admits that "remuneration" is the test of what "wages" include, and that "remuneration" does not include all non-cash benefits the employer confers. As regards food and lodging furnished without charge, they are not "wages" unless they are "remuneration," and the regulation admits that not all food and lodging benefits are "remuneration." Only "ordinarily" and "generally" they are, because "generally" they constitute an appreciable part of the "total remuneration." Thus they are "remuneration" because they are part of "remuneration." The employer who concludes subjectively that his free meals are not "remuneration," will not find anything in the regulation to tell him whether he is right or wrong on the particular facts of his case, except perhaps, a slant by the Treasury in favor of their being remuneration is signalled or intimated by use of the words "ordinarily" and "generally." The employer has no way of telling whether or not his plan is the ordinary or general case, except language that seems to intimate the regulator is thinking of rather massive benefits as general, which the seaman example illustrates. He would know that a seaman gets all his meals free, not just lunch, and gets besides, as "lodging," at least a bunk to sleep on off watch, perhaps a stateroom. The concluding part of the quoted regulation would tell him to compare the food or lodging benefits with the "total remuneration," but he is not told

**1354**

what ratio will trigger a classification one way or the other; *i. e.*, what part the regulator deems an "appreciable" part. There is, indeed, nothing to show the regulator considers the construction of such a ratio the sole test of what is or is not "remuneration."

Viewed as a hunting license to authorize IRS agents to flush up additional revenue from employers, the regulation is brilliantly conceived. As a guide to employers in their relations with employees, it is nearly worthless. Congress intended by the use of the word "wages" to set a standard that was "intentionally narrow and precise." *Central Illinois, supra*, 435 U.S. at 31, 98 S.Ct. 917, 922. "Because the employer is in a secondary position as to liability for any tax of the employee, it is a matter of obvious concern that, absent further specific congressional action, the employer's obligation to withhold be precise and not speculative." *Ibid.* The Court then refers to a passage in our *Humble Oil & Refining Co.* case *supra*, 442 F.2d at 1369–70, 194 Ct.Cl. at 933, which rejects the imposition of retroactive liability on an employer for not withholding when the duty to withhold was not clearly spelled out when the alleged wages were paid. The concurring opinions in *Central Illinois* further stress this theme of retroactivity.

We think in any case when the only guide to Treasury policy was the unsatisfactory regulation above quoted, the employer should not be assessed for not withholding unless he could have told from the statute itself that his proposed free food or lodging for employees was "remuneration," and in this regard, the statute should be given a fairly strict though not hostile construction. Should there be a timely Treasury regulation stating clearly what, in the Treasury view, is "remuneration," in this context, a different situation would be presented, as to which we express no opinion.

Defendant points out that the above regulation was quoted and applied to make FICA and FUTA taxes apply to free meals for restaurant employees in *S. S. Kresge Co. v. United States*, 379 F.2d 309, 310 (6th Cir. 1967). That circuit, however, did not have, as we do, the benefit of the criteria to apply to regulations in this area, as prescribed in *Central Illinois, supra*, and the circuit says the regulation creates a "presumption" of taxability in such cases, which perhaps it does, but perhaps the presumption was impossible to rebut because the court had not been taught to exclude from its analysis the broad and sweeping definition of "wages," rejected in *Central Illinois.*

Thus we conclude that in calendar 1971 plaintiff was not obliged to withhold and pay FICA and FUTA taxes based on the theory the free meals it furnished employees were "wages."

■ There still remains the issue of the timeliness of plaintiff's claim for refund. That issue applies only to the taxes on the meals as "wages" at the 45 cents valuation, which plaintiff timely paid. It is conceded that plaintiff did file timely requests as to the additional amounts it paid to make up the tax on meals at $1.25. In 1973, after a dispute had arisen on audit, plaintiff filed a "protest" defending the 45 cents valuation but also asserting that FICA and FUTA taxes did not apply to the meals at all. Unless this "protest" is taken as a request for refund of the original tax, no timely such request was ever filed, since the 1975 formal claims were more than three years after the returns and more than two years after payment. IRC § 6511(a).

■ The 1973 "protest" cannot be taken as an informal claim for refund of the FICA taxes for the reason that, if it requested any refund of the original payments, it did so only for the employer's share. Plaintiff never purported, and does not purport now, to be seeking any adjustment on account of the employees' share, which had been withheld from them, and this despite the fact that by its own theory maintained in the protest, the withholding by it was necessarily unauthorized and unlawful. Plaintiff cannot prosecute a claim for refund in that fashion. In *Atlantic Department Stores v. United States*, 557 F.2d 957 (2d Cir. 1977), it is held that the claim for refund must show that the employee has, if feasible, been reimbursed for the tax overpayment collected from him. This is imputed to certain statutory and

regulatory provisions therein set forth, which need not be repeated here. It seems a clearly equitable requirement since the employer should not be allowed to correct its own error as affecting its own pocket, but not as affecting the employee's. Plaintiff says *Atlantic Department Stores* deals with an error, admitted to be such by the government, and it is inequitable to require it to pay the refund to the employees when the government admits no error in the payment and indeed is demanding more. There is much to be said for this argument, but we think it should have been made in the first instance in or with the claim for refund. Possibly defendant might in the circumstances have accepted statements showing that plaintiff had been in contact with the employees (at least those still on its payroll) and was doing whatever was feasible to protect their interests, short of actually distributing to them a still hypothetical refund. At any rate, we think the protest lacked an indispensible element that a formal claim would or should have had, alerting defendant's officials to the problem and showing what plaintiff had done or would do to solve it. Six years have now passed from the protest date, and whatever difficulties there ever were in protecting the employees will now be much increased. We think this defect in the protest excuses defendant's not regarding it as a claim for refund of the FICA taxes, especially in light of the absence of any express statement that a refund was demanded. Defendant was late in raising this issue, doing so only in its reply brief, but plaintiff has been given a chance to respond. Having heard from both, we have no hesitation in saying defendant is right.

The FUTA taxes fall wholly on the employer, and, therefore, the question of overdeducting from employees would not arise. There was no reason to see refunding the taxes paid on the 45 cents value as involving any other or different problem than the tax asserted on the added value up to $1.25. In these circumstances, we think the Commissioner should have viewed the protest as advising him that the taxpayer contended it had overpaid FUTA taxes, and the requirements for an informal claim for refund are met. *United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941); *Newton v. United States*, 163 F.Supp. 614, 143 Ct.Cl. 293 (1958).

A curious feature of this case is that in midst of briefing of the summary judgment motion, defendant filed checks totaling $41,609.12 with our clerk, together with a motion to dismiss. The motion asserted that defendant had tendered refund of the full amount due, with interest; therefore, there was no money claim before the court; therefore, by the doctrine of *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), we lacked jurisdiction. By order dated October 2, 1978, we held that we had jurisdiction, citing *Church of Scientology of Hawaii v. United States*, 485 F.2d 313 (9th Cir. 1973), that *Testan* did not apply, but that plaintiff's expectation of a res judicata or collateral estoppel effect from the anticipated decision was not a sufficient reason for trying a case when no money was at stake. We ordered suspension. By order of October 26, 1978, however, we lifted the suspension, plaintiff having pointed out that by I.R.C. § 7405, if plaintiff took the check, defendant could sue in a U.S. District Court for recovery of a refund erroneously paid. Defendant later denied it had any such strategy in mind, and we are sure it did not. However, we believe a party who has sued the United States in this court in a tax case is entitled to a trial or, as here, a decision on dispositive motion, in this forum, unless the United States is willing to have judgment entered against it. Such disposition as was proposed here was offered as a compromise settlement which plaintiff had a right to refuse. As with any other settlement negotiations, we have disregarded it in our adjudication of the case. Defendant's vigorous and able prosecution of its cross-motion would belie any inference that it tendered the check because it believed it had no case, so we remain in the dark what its strategy was. Defendant withdrew the check after oral argument, and thus the offer is at an end.

Accordingly, defendant's cross-motion for summary judgment is granted with respect to the FICA tax payments for 1971 based on the 45 cents value of the meals, and the petition with respect to that issue is dismissed. The said motion is denied with respect to all other issues. The plaintiff's motion for summary judgment is granted with respect to all the 1971 FUTA taxes in dispute and with respect to the 1971 FICA taxes as assessed on the meal values over 45 cents, as explained in the opinion. In other respects the plaintiff's motion for summary judgment is denied. Interest is to be paid according to law and penalties are to be refunded conformable to our decision. Judgment for plaintiff is entered to the extent our conclusions require. The cause is remanded to the trial division for proceedings under Rule 131(c) to determine the amount of recovery.

DAVIS, Judge, concurring in the result:

Although there is a non-frivolous argument that, despite the stipulation of the facts, we should remand for a trial on the main issue of whether the meals constituted compensation or remuneration, I agree with the court that, since the parties have presented the matter on that stipulation and do not particularize any further facts to be developed, we can and should decide the question on the record now before us. However, I cannot join the court's opinion on that issue[1] because, in my view, it ranges far too widely and gratuitously covers ground wholly unnecessary to the decision of this particular case. The court's "excess" observations suggest that almost all free meals by hotels and restaurants, no matter what the circumstances, are excluded from "wages" under FICA and FUTA, and the opinion denigrates a long-standing regulation which includes such meals in "wages" once they are found to be compensation or remuneration. I think that, in all the circumstances,[2] it is a mistake to go so far beyond the specific facts of this case, and therefore separate myself from the large segments of the court's opinion which, in my view, constitute dicta.

My sole ground for concurring in the result is that, on the particular facts now before us, the meals were *not* compensation or remuneration to the employees (and accordingly, by its own terms, outside the coverage of Treasury Regulation §§ 31.-3121(a)–1 and 31.3306(b)–1). The facts which lead me to that conclusion are set forth in the "non-excess" portion of the court's opinion and I need mention only the following: the small value of the meals even in 1971; the absence of any indication that the employees were getting more than that relatively low value; the employers' own purposes in furnishing the meal; the relatively low percentage of the employees' total remuneration which is involved. The regulation excludes from remuneration "facilities or privileges" "if such facilities or privileges are of relatively small value and are offered or furnished by the employer merely as a means of promoting the health, good will, contentment, or efficiency of his employees." The meals involved here fit well within that category.[3] True, the regulation goes on to except *"ordinarily"* meals or lodging furnished to restaurant or hotel employees, "since *generally* these items constitute an *appreciable* part of the total remuneration of such employees" (emphasis added). As I see it, the meals here fall within the exception permitted by the regulation's meal exception itself. No more need or should be decided or said.

---

1. I do join the segment of the court's opinion dealing with the adequacy of the refund claim.

2. Including the parties' complicated efforts, on the one hand, to terminate this case without a court ruling, and, on the other, to turn it into a major ruling and precedent in this field of the law.

3. The IRS never made any effort to include the value of uniforms furnished to employees even though a union agreement seemed to value the daily worth of a uniform at $1.00 (the agreement provided for plaintiffs to pay that amount for each day they failed to furnish a uniform).